BRINKERHOFF ZINC COMPANY, Appellant, v. BOYD et al.; BANK OF AURORA, Appellant.

Division One, January 16, 1906.

1. **CORPORATION: Liability of President: Reimbursement. A** corporation is not responsible for the acts of its president committed, not in the line of his duties as president, but in his capacity as a servant or employee of another. And if that other is sued by the corporation he cannot set up against the company a loss or perversion of his funds by the president while acting as his employee, and be reimbursed out of the company's assets for such loss.

2. ———: ———: ———: **Mining Lease: Set Off: Bonds as Collateral Security.** A mining corporation leased its properties to respondent for a ten per cent royalty on all mineral mined, having previously issued $12,000 in bonds and secured them by a deed of trust on the properties, and these bonds were placed with a bank as collateral security for the company's notes. Respondent on the execution of the lease employed the president of the company to manage his mining operations near by, and claims that he lost a great deal of money through the

president's mismanagement and unfaithfulness. Thereafter respondent took up the notes and the bonds were turned over to him and on a foreclosure sale the properties brought $13,500, and $12,000 of this money was turned over to the respondent, and the company sues him for the difference between that sum and the amount of the notes. *Held*, that respondent cannot set off any claim he may have against the president against the claim of the company.

3. BONDS: Collateral Security. On the foreclosure of a deed of trust given by a corporation to secure its bonds, the holder of the bonds who has received them as collateral security for the payment of the company's notes, is entitled to receive the amount of the notes, and not the face value of the bonds, if the property sells for an amount in excess of the amount of the notes.

4. ——: ——: Declaration of Sale: Consideration. The directors of a corporation, after respondent had secured $12,000 of its bonds as collateral security for $5,500 of its notes, executed to him, without any further consideration, a declaration of sale of the equity of redemption in the properties, and on a foreclosure sale of the deed of trust securing the bonds the properties brought $13,500 cash, and the trustee turned over to respondent the face value of the bonds. *Held*, that the so-called declaration of sale was without consideration, and, although made by the directors under the belief that the company was liable to respondent for the individual debts of its president, was void, and the company is entitled to recover from respondent the difference between the amount of the notes and the face value of the bonds. The directors were trustees for the care and management of the company's properties, and could not give them away, for they did not belong to them.

5. ——: ——: ——: Surrender of Notes. And where the company's notes were first made to a bank and the bonds put up with it as collateral security, and afterwards these notes were bought by respondent, the fact that, when the declaration of sale of the equity of redemption in the properties was executed by the directors, he turned over the notes to the president of the company, and after the foreclosure of the deed of trust and the payment to him of the amount of the bonds he turned them over to him also, is immaterial as affecting the validity of the declaration of sale, or as affecting the right of the company to the difference between the amount of the notes and the amount paid respondent by the trustees.

6. CORPORATION: No Meeting of Directors: Declaration of Sale. A declaration of sale of the company's equity of redemption in

all its properties, executed by two of the three directors who came together at the residence of one of them without call or notice and signed the instrument, and afterwards executed by the other on the street, is not binding on the company. When the law authorizes an act to be done only by a board of directors at a stated or called meeting, it cannot be done by the directors acting severally at different times and places.

7. ——: ——: ——: **False Recital.** Nor can validity be given to such act by the members all signing a paper falsely reciting in the written instrument that they were all present at a meeting of the board and consented.

8. ——: **Bonds: Collateral Security: Statute of Frauds.** The fact that the agreement of the company, by which a part of its bonds placed in respondent's hands as collateral security was, subject to his debt, to be collateral security to another of the company's creditors, was not in writing, is no concern of respondent. That is a defense that the company might make, but as it has not done so, it is not his province to make it, and he cannot refuse to disgorge the amount represented by those bonds, after his own debt was paid by a foreclosure of the deed of trust, by setting up the Statute of Frauds against that agreement.

9. ——: ——: ——: **Liability of Trustee.** The trustee in the deed of trust given to secure the payment of $12,000 of bonds, placed in the hands of the respondent to secure the payment of $5,500 of the company's notes, is liable to the company, on foreclosure sale of the properties for $13,500 of which he paid $12,000 to respondent, for the difference between the amount of the notes and the $12,000 so paid, although respondent at the time claimed to be the owner of the bonds under a void declaration of sale to him of the company's equity of redemption in the properties covered by the mortgage—the trustee having notice of the company's claim before he paid the money to respondent.

Appeal from Lawrence Circuit Court.—*Hon. Henry C. Pepper,* Judge.

REVERSED AND REMANDED *(with directions.)*

*H. E. Howell* and *H. H. Bloss* for appellant Brinkerhoff Zinc Company.

(1) This record will be searched in vain for a consideration that induced the giving of the declaration

of sale, except indebtedness that was due Mr. Boyd for
interest advanced months before. This matter ana-
lyzed was simply the giving of a new direct obligation
in a larger sum for the surrender of smaller obligations
and as to the increased indebtedness thus resulting, the
larger obligation is without consideration. Dickison
v. Tunstall, 3 C. P. 128. Or expressing the same prin-
ciples of law in another way, where the second obliga-
tion imposes greater burdens without additional con-
sideration, as to the additional burden, it is void. Gates
v. Hackethal, 57 Ill. 534; McEldary v. Jones, 67 Ala.
203; Tyler v. Meek, 4 Blackf. 388; Proctor v. Heaton,
114 Ind. 250; Phetteplace v. Steere, 2 Johns. 442. The
consideration of a contract, to be valuable in the eye of
the law, must be induced by some right, benefit, profit
or interest that will accrue to the party making the
promise, or some forbearance, detriment or loss incur-
red by the promisee on the strength of the promise.
Carr v. Card, 34 Mo. 513; Hudson v. Busby, 48 Mo. 35;
Williams v. Jansen, 75 Mo. 681; Bank v. Graham, 74
Mo. App. 251; 6 Am. and Eng. Ency. Law (2 Ed.), 678;
Crombie v. McGrath, 139 Mass. 550; Logan v. Lee, 10
Ark. 585; Goldsborough v. Gable, 140 Ill. 206; Columbia
Incandescent L. Co. v. Amr. Mfg. Co., 64 Mo. App. 115;
Spiva v. Coal and Mining Co., 88 Mo. 68; Powell v.
Powell, 23 Mo. App. 64. Strange as it may seem, the
greater part of this record is filled with evidence of-
fered by defendant Boyd to justify his holding the ex-
cess of this fund, the matters that relate to his expendi-
tures made in his own business by Brinkerhoff as his
agent reiterated time and again. That these expendi-
tures can not be taken into account against the plain-
tiff company requires no elaboration, for before a cor-
poration can be charged with the conduct of its officers
or agents, the act or conduct of such agent must be
within the line of his duty in the business of the com-
pany sought to be charged, certainly not an act done
in the line of the duty assigned to such person by the

person seeking to hold the corporation. Bank v. Schaumburg, 38 Mo. 228; Eckert v. St. Louis Transfer Co., 2 Mo. App. 36; 7 Am. and Eng. Ency. Law (2 Ed.), 826; Alexander v. Relfe, 74 Mo. 495; Bank v. Bank, 59 Fed. 338; Breyfogle v. Walsh, 80 Fed. 172. (2) As to liability of Brown who acted as trustee, the evidence conclusively shows that he had written notice served on him of the plaintiff's contention at the time of foreclosure and that after having this notice he took a bond and paid the fund over to Mr. Boyd. "The question of the proper disposition of the surplus is an important and sometimes difficult one; and must be decided by the party executing the power, at his peril. In case of doubt, he should refer the determination of the question to the court, in a proceeding to which the various claimants of the fund are made parties." 26 Am. and Eng. Ency. Law 957; 2 Jones on Mortgages (4 Ed.), 1927; Goode v. Comfort, 39 Mo. 313; Carter v. Abshire, 48 Mo. 300; Chesley v. Chesley, 49 Mo. 540; Shearwood v. Saxton, 63 Mo. 78.

*McNatt & McNatt* for appellant Bank of Aurora.

*H. Brumback* and *Edw. J. White* for respondents.

(1) It is no part of the duty of the trustee, under a trust deed to secure indebtedness, to pass upon or to raise question upon the good faith or the fraud involved in a sale of the securities; but his conduct is governed by the trust deed. Reid v. Mullins, 48 Mo. 344. (2) No financial or other oppression is shown by Boyd, and the fact that he paid more for the bonds purchased than the defendant, Bank of Aurora and its officers were willing to pay at the time, is evidence that it was adequate. (3) The Bank of Aurora acquired no equity in the bonds under the unauthorized verbal promise of Brinkerhoff. There was no consideration given for such promise, even if it had proceeded regularly, from

the corporation; only the directors could dispose of the bonds of the plaintiff, and Brinkerhoff's promise to Davis and the latter's unauthorized promise to give Brinkerhoff the note of the Bank of Aurora, could not bind either corporation and notice of this incompetent, unauthorized negotiation, or scheme, was notice of nothing, since it amounted to nothing. (4) Nor is there any more merit in the contention—which the Bank of Aurora, as a creditor of the plaintiff is legally estopped to urge—that "there was no notice of the directors' meeting at which the resolution, selling the bonds to Boyd, was passed. Why talk about notice or want of notice, when all the directors were present? The only reason for giving notice is to get them there, and they were there when this sale was made and the resolution passed. Hill v. Coal Co., 119 Mo. 9; 1 Beach on Priv. Corp., sec. 279; Ins. Co. v. Holmes, 68 Mo. 601. (5) The defendant Boyd's motion to dismiss this suit ought to be sustained, as the present second amended petition is not an amendment, but a new cause of action. The original suit was for an injunction, to restrain a sale of real estate; no damages were asked, but the relief was of a wholly different kind. In this suit a straight money judgment is asked, and that is all. The test of determining whether an amended petition states a different cause of action or an amendment of the original cause, is "that the same evidence will support both positions; that the same measure of damages will apply to both. If both of these fail, the new pleading is not an amendment." Scoville v. Glasner, 79 Mo. 449; Holiday v. Jackson, 21 Mo. App. 660; Sears v. Mo. Mtg. & C. Co., 56 Mo. App. 122. (6) The purchase of the bonds by Boyd was a legitimate and absolute purchase, made necessary to protect his other interests, under the subsequent lease; there is no evidence of fraud, collusion or duress and the contract of the plaintiff, made through its president and all of its board of directors, should be upheld. It is held, in Missouri, that where a

bank takes up a note, secured by deed of trust, to prevent foreclosure, retaining the note and mortgage as collateral security, as against the maker, the transaction is a purchase, with a right, on default, to foreclose the mortgage. Swope v. Leffingwell, 72 Mo. 348; Colebrook's Col. Sec. p. 304; Jordan v. Harrison, 46 Mo. App. 172; Carroll v. Bank, 8 Mo. App. 249. And compromises between pledgor and pledgee are always supported, if based upon a valuable consideration. Colebrook's Col. Sec. p. 182; 1 Beach, Mod. Law Corp. sec. 430. The payment of the notes, by Boyd, in pursuance of the resolution and the delivery and cancellation of the same, and his acknowledgement of the debts due from the plaintiff to him, estops both it and its creditors from repudiating the transaction. Colebrook's Col. Sec. pp. 550, 551; Brinkerhoff v. Brinkerhoff, 23 N. J. Eq. 477; Beach on Priv. Cor. secs. 65, 295.

VALLIANT, J.—This is a suit in equity to cancel a transaction whereby the board of directors of the plaintiff corporation essayed to sell to defendant Boyd $12,000 of mortgage bonds issued by plaintiff, and to recover of Boyd and the trustee in the deed of trust a part of the proceeds of the foreclosure sale that is alleged in the amended petition to be in excess of the debt for which the bonds were hypothecated.

There is little if any dispute as to the material facts of the case.

The Brinkerhoff Zinc Company, the plaintiff herein, is a mining corporation in Lawrence county. Its total assets consisted of seven acres of land which were supposed to contain valuable mineral deposits, and a mining plant thereon consisting of buildings, machinery, etc. On November 1, 1897, the plaintiff was indebted to the Miners and Merchants Bank of Aurora, Missouri, in the sum of $5,500, represented by two notes executed by the plaintiff to that bank. To secure that indebtedness the plaintiff executed its 120 bonds of

$100 each, that is, $12,000 aggregate, of date November 1, 1897, due in five years from date, bearing eight per cent semiannual interest, secured by deed of trust on all its property and delivered the same to the bank as collateral. The deed of trust was duly recorded.

Afterwards, on August 13, 1898, plaintiff executed a lease of its land and mining plant to defendant Boyd for a term of ten years, with prospecting and mining rights. The consideration for the lease was that the lessee was to carry on mining on the leased land and pay the plaintiff a royalty of ten per cent of the gross proceeds of the operation. If the lessee failed for thirty days to work the mines, the lessor could by giving him thirty days notice terminate the lease. The lessee had the right at the end of his lease, either by expiration of its term or by forfeiture, to remove all buildings, machinery and improvements he may have put thereon.

Shortly after the execution of the lease Boyd entered into possession and during the time he remained in possession he placed valuable mining machinery on the land, but he did little if any mining on it. He was at the same time interested in mining property on other land adjoining, and he carried on mining on that other land and used in that business the machinery, etc., which he had placed on the plaintiff's land. He also subleased a portion of the leased premises to another concern that was owned and managed by relatives of his, and that other concern did no substantial mining on the land leased from the plaintiff. But the plaintiff never attempted to avail itself of the right given in the lease to declare it forfeited on account of failure to operate the mine.

Mr Boyd resided in Chicago. Shortly after taking his lease he employed F. H. Brinkerhoff as his agent resident near the leased premises, and gave him a written power of attorney to represent him in his mining operations. This Brinkerhoff was also the president of

the Brinkerhoff Zinc Company, the lessor. Brinkerhoff's wife was one óf the principal stockholders in the concern, but he owned only two shares. Boyd, through the agency of Brinkerhoff, spent a considerable amount of money in machinery and in operating mines on adjoining land, but it was not spent on the land leased from plaintiff, and the plaintiff had no interest in the other lands. Brinkerhoff himself, however, had a fourth interest in them. The agency of Brinkerhoff continued from April, 1898, to January, 1899, during which period the defendant Boyd says he lost a great deal of money. In January, 1899, Boyd's son-in-law, Moore, supplanted Brinkerhoff as agent. Boyd in his testimony lays blame on Brinkerhoff for his losses and accuses him of bad faith. After taking his lease Boyd advanced to the plaintiff money to pay two semiannual installments of interest on the $12,000 mortgage bonds, and that money, amounting to $480, was so applied and credited on plaintiff's notes held by the M. & M. Bank. In December, 1898, this bank sold the $5,500 notes to Mr. Boyd, and together with those notes delivered to him the $12,000 collateral mortgage bonds. The price paid for the notes was $4,800, being a discount of $700. One of the bank officials testified that the reason they sold at that price was that they had held the notes for sometime, and that the State bank examiner objected to their carrying it longer, it was not satisfactory bankable paper, and therefore they wanted to get rid of it.

Soon after his purchase of the notes from the bank, Mr. Boyd obtained from the directors of the plaintiff corporation a paper writing that is called in this record a declaration of sale, which purported to convey to him the plaintiff's right of redemption in the mortgage bonds. This document was prepared by Mr. Boyd's attorney before he bought the notes from the M. & M. Bank, and was executed immediately afterwards. It recites that a meeting of the board was held at the company's office, by consent of all the directors, to con-

sider the proposition of Mr. Boyd to pay the $5,500 debt of the corporation to the bank, and to purchase the $12,000 as mortgage bonds deposited with the bank as collateral security. Then follows a whereas, the interest on the bonds since November 1, 1898, amounting to $480 is due and the corporation has no means to pay it, and the bank is threatening to foreclose, and Boyd having theretofore advanced $480 to pay the interest which accrued in 1898 and "has expended large sums of money in improving the property of the company and is a judgment creditor to the amount of $250, therefore, in consideration of his payment to the bank of the $5,500 debt and surrender of those notes to the company, the cancelling of the debts he holds against the company and other good and valuable consideration," the president and secretary were thereby authorized to transfer to him all the right and title of the company in the bonds. The paper was signed by Brinkerhoff as president, and Haswell as secretary. There was in fact no meeting of the board of directors; only Brinkerhoff and Haswell were together at the latter's residence, and signed the paper. The board was composed of three members, Brinkerhoff, Haswell and one Salmon; the latter was not in town at the time, but when he came back he signed the declaration at the request of Brinkerhoff.

The by-laws of the corporations authorized the president to call a meeting of the board by giving notice in person or by mail. No notice of this meeting was given. The $250 judgment in favor of Boyd, mentioned in the declaration of sale, was for that much of the $480 he had advanced to pay the interest which had accrued in 1898. There was no other consideration for the transfer of the right of redemption to Boyd beyond his payment of the $5,500 debt to the bank, and the $480 advanced to pay interest. After the execution of the declaration of sale Boyd delivered to Brinkerhoff as

president of the plaintiff the notes bought of the M. & M. Bank.

The bank of Aurora, one of the defendants herein, was at the time of the above-named transactions a creditor of the plaintiff corporation to the amount of $1,050, evidenced by a note for that sum, and an agreement was made between that bank and the plaintiff through its president that $1,000 of those mortgage bonds should be given to the bank as collateral for that debt, subject to the $5,500 debt to the M. & M. Bank; that is to say, when the debt to the M. & M. Bank was paid and the collateral redeemed, $1,000 of the bonds were to be given to the Bank of Aurora on account of its debt. The cashier of the M. & M. Bank was informed of this fact when the bonds were delivered to him, and Mr. Boyd was also informed of it before he purchased the bonds from the M. & M. Bank. The plaintiff also owed other debts to various persons amounting to about $3,000.

After Mr. Boyd got possession of the bonds, the interest then being in default, he caused the trustee to advertise the property for sale to satisfy the $12,000 mortgage debt. It was expressed in the advertisement that the sale was to be subject to Boyd's lease. When that advertisement appeared the plaintiff corporation brought this suit. The aim of the original petition was to set aside this declaration of sale of the bonds, and to enjoin the trustee from selling the property covered by the deed of trust subject to the leasehold rights of Boyd. Upon a preliminary hearing the court granted a temporary injunction as prayed. Thereupon Boyd caused the trustee to withdraw that advertisement and re-advertise the property for sale under the terms of the deed of trust, omitting the condition that the sale was to be subject to the lease. The trustee then proceeded to foreclose; the property brought at the trustee's foreclosure sale $13,500, which the purchaser, who is a stranger to this record, paid in cash to the trustee. Out

of the proceeds of the sale the trustee paid the costs of the foreclosure proceedings, then paid to Mr. Boyd the full amount of the $12,000 of bonds and interest to date, and a balance of $196.40 was paid by the trustee to parties holding a second mortgage. After the sale the bonds were delivered to Mr. Brinkerhoff. Before the trustee paid the money over to Mr. Boyd he was notified that Boyd's interest in the proceeds was only the amount of $5,500 notes and interest, and that the balance belonged to the Brinkerhoff Zinc Company, but the trustee after taking advice of counsel, took an indemnifying bond from Mr. Boyd and paid all the money over to him, or his agent. Then the plaintiff filed an amended petition in this suit, the purpose of which is to annul the declaration of sale of the bonds to Boyd and to recover of him and the trustee the proceeds of the trustee's sale remaining after paying the notes bought by Boyd from the M. & M. Bank. The Bank of Aurora, which is made a defendant, sets up by its answer its claim to $1,000 of the bonds, and asks judgment for that proportion of the proceeds of the sale. The trial resulted in a judgment for defendants Boyd and Brown, the trustee, and the plaintiff and the Bank of Aurora appeal.

The plaintiff alleges and introduced evidence tending to show that the failure of the defendant Boyd to work the mines was a willful scheme on his part to deprive the company of the only revenue it had to hope for by which it could pay the interest on its bonds, and that its president was intimidated into signing the declaration of sale of the bonds. On the part of defendant Boyd it is alleged and his testimony tends to prove that Brinkerhoff misused some of the money that was sent him to operate the mines. Mr. Boyd is quite strong in his characterization of Mr. Brinkerhoff. He denies that he willfully failed to work the mines on plaintiff's land to prevent plaintiff from having means to pay its

debts, but says that the mines were not worked because they were poor and it would not pay to work them.

The main force of the defense on the part of Mr. Boyd is that through what he considers the unfaithfulness of Mr. Brinkerhoff (he uses very much stronger terms than that) he has lost a large amount of money in his mining ventures in that vicinity, and that he was entitled to recover what he could out of the assets of the corporation, of which Mr. Brinkerhoff was the president, to reimburse him to some extent for his unfortunate outlays.

The error that runs through the whole case on the part of defendant Boyd is that the plaintiff corporation is responsible for the acts of Brinkerhoff because he was its president, although the acts were committed, not in the line of his duty as president, but in his capacity as servant or employee of the defendant Boyd. The very lease which defendant Boyd held placed in his keeping all the property of every kind whatsoever that belonged to the plaintiff corporation, and reduced its whole business operations to receiving the royalty that he agreed to pay. On executing that lease the Brinkerhoff Zinc Company practically went out of business as a mine operator, and there was nothing in that line of work for its president to do. But Mr. Boyd was going into the business on his own account and saw fit to employ Mr. Brinkerhoff as his chief agent and active business manager. In his capacity as agent for Boyd, managing Boyd's individual business, Brinkerhoff could not involve the corporation of which he was president, whether he acted wisely or unwisely, faithfully or unfaithfully, whether he obeyed or disobeyed his master's orders. It is argued for the plaintiff that Brinkerhoff was intimidated into executing the so-called declaration of sale of the bonds by threats of holding him to account for his alleged misuse of defendant Boyd's money. The pleadings and evidence on the part of

192 sup—39

defendant Boyd show that he believed himself a victim of misplaced confidence. If there was in truth any ground for that belief and if Mr. Boyd or his agents were but half as denunciatory of Mr. Brinkerhoff during the negotiations with him that led to the execution of the document in question as they are now in their pleadings and brief, it might afford a foundation for the plaintiff's contention that Brinkerhoff was intimidated into signing the paper. It is not necessary, however, to decide that question of fact. The evidence on both sides shows that Boyd's losses, if any, were in mining ventures and operations conducted on his own individual account and not even on the lands leased from the plaintiff and therefore the stockholders and creditors of the plaintiff are under no obligation to make those losses good. The evidence on the part of defendant Boyd tends to show that Brinkerhoff during the time covered by this record was in his employ and was deriving his means of living from that employment. If that is so, one of the natural consequences that might be expected from the situation is that Brinkerhoff would thereby be influenced to favor his new employer, neglect his obligation to the corporation from which he has nothing to expect, and look with complaisance, if not connivance, on the failure of his master to earn a royalty for the corporation by working its mines. In that view of the case, the corporation might have cause to complain of Mr. Boyd that he had improperly influenced its officer to betray or neglect his duty. What is here said is not to imply that in the employment of Brinkerhoff by Boyd there was in fact any improper motive, but only to illustrate how unreasonable it would be to allow one in his own private business to employ as his agent one who is an officer of the corporation and then hold the corporation liable for acts of the agent committed, not as an officer of the corporation, but as agent or servant of his employer.

The evidence shows that defendant Boyd did put

some improvements in the way of mining machinery on land leased from plaintiff, but it also shows that that was done under the express terms of the lease which gave him the right to remove the same at the expiration of his lease, whether by the expiration of the term or by forfeiture, and it also shows that after the foreclosure sale Mr. Boyd sold this machinery to the purchaser at the foreclosure sale who paid him $4,000 for the same. Thus at the date of the so-called declaration of sale of the bonds to Boyd the only item of debit against the corporation in account with Boyd, was the amount of the notes he had purchased from the M. & M. Bank, the interest he had paid and the interest that had accumulated, for all of which he was entitled to use the whole issue of the $12,000 of bonds as collateral security. He was then entitled to a foreclosure of the deed of trust and to payment of his notes and interest out of the proceeds of the trustee's sale; that was all that he could have recovered in any form of procedure against the corporation, and in conceding that he was entitled to that much we would have to concede also that the corporation had no counterclaim against him for failure to work the mines, a point that it is not necessary now to decide.

It is one of the grounds of complaint against Brinkerhoff that he misrepresented the value of the ore deposits on the plaintiff's land, and the excuse offered for not working the mines is that there was not sufficient ore there to pay for mining. We do not know from this record what the fact was in that particular, because the work that was done in that way on the land leased from the plaintiff was not sufficient to amount to a fair test, but the seven acres of land had no extraordinary value except for this mineral deposits and that value is to some extent indicated by the fact that it brought $13,500 in cash under the trustee's hammer. It is therefore safe to say that the $12,000 of bonds were worth their face value when the declaration of sale was executed.

The deed of trust covered all the property the plaintiff corporation owned, and at a sale under the deed of trust the surplus of the proceeds over the amount of the debt for which the bonds were pledged as collateral, constituted the entire estate of the corporation. By that declaration of sale the directors essayed to give that entire estate to defendant Boyd for no cosideration at all. That surplus, as shown by the sale, was worth about $6,000, and it would have gone into the treasury of the corporation but for this transaction; as it is, it has gone to defendant Boyd, and the plaintiff has nothing in the way of compensation. We need not stop to inquire what pressure or inducement was brought to bear on these directors to obtain from them this document, whether fear or persuasion; it is sufficient to say that they were trustees for the management and care of the property of the corporation and whilst they had the right to deal with it in a business way, it did not belong to them in their own right and they could not give it away.

Those directors may have then believed that the corporation was liable for the losses that defendant Boyd sustained, or claimed to have sustained, though the mismanagement of Brinkerhoff because Brinkerhoff was president of the corporation and that idea was doubtless pressed upon them as it is now pressed upon this court, but if they acted under that idea they acted under an erroneous idea, if they transferred the corporation's equity of redemption in those bonds for that consideration, they transferred it for no consideration, the transfer was in violation of their duty as trustees and beyond their authority as directors.

The fact that the notes were surrendered to Brinkerhoff as president and accepted by him on the execution of the document in question and that the bonds were likewise delivered to him after the foreclosure sale are immaterial; what the plaintiff corporation was entitled to was the money for which its property sold, not

the cancelled paper, and Brinkerhoff as its president could not bind the corporation by taking the paper, then worthless, in lieu of the money.

There was no notice given of a meeting of the board of directors, there was really no meeting called and none held when this document is said to have been authorized. The board consisted of three directors, two of them came together and signed the paper, the third was out of town, when he returned, how long afterwards is not shown, the paper was shown to him and he signed it. When the law authorizes an act to be done only by a board of directors at a stated or called meeting the act cannot be done by the members acting severally at different times and places, nor can validity be given to the act by the members all signing a paper falsely reciting that they were all present at a meeting of the board and consented. But even if this act had been done at a regular meeting of the board it would have been invalid, because it was in effect giving away the whole estate of the corporation without any lawful consideration.

It is contended by respondent that the claim of the Bank of Aurora to $1,000 of the bonds cannot be maintained because the alleged contract is within the Statute of Frauds and is not in writing and that there was no consideration to support it. That, however, is no concern of the respondents; if the proportion of the proceeds of the sale applicable to the amount of the bonds claimed by the Bank of Aurora is not to be paid the Bank of Aurora, it would have to be paid to the plaintiff and it would then be a matter of adjustment between the plaintiff and the bank. The plaintiff in its petition states that the Bank of Aurora is entitled to that amount of the bonds and the bank assents to that statement; that is, therefore, sufficient to justify the court in decreeing as between the plaintiff and the bank that the bank is entitled to that amount.

The defendant Brown, the trustee in the deed of

trust, is liable also with the defendant Boyd for the amount of the proceeds of the sale that should have been paid to the plaintiff. Mr. Brown had notice of the plaintiff's claim before he paid the money to Mr. Boyd, he was in fact a party to this suit which was then pending, he took a bond to indemnify himself, showing that he acted deliberately and advisedly. In his deposition defendant Brown testified that, after deducting the costs of the foreclosure and the small sum he paid on the second mortgage, $196.40, he paid the balance of the purchase money to defendant Boyd. He does not say how much the cost of foreclosure was and we can therefore only estimate it. Defendant Boyd was entitled out of the proceeds to have $5,500, the amount of the principal of the notes purchased from the M. & M. Bank, plus $348.30 interest thereon from November 1, 1898, to July 13, 1899, the date of the foreclosure, plus $480 advanced in 1898 to pay previous installments of interest, plus $40 interest on that advancement, total $6,368.30. To that sum add $196.40 paid on the second mortgage, and $675 estimated as the cost of the foreclosure, gives $7239.70, which deducted from $13,500, the proceeds of the sale, leaves $6370.30, the amount that the trustee should have paid to the plaintiff on July 13, 1899, $1,000 of which belonged to the Bank of Aurora.

The judgment is reversed and the cause remanded to the circuit court with directions to enter a decree cancelling the document called the declaration of sale of the bonds in question of date December 25, 1899, and rendering judgment against the defendants Charles L. Boyd and Will T. Brown in favor of the plaintiff, the Brinkerhoff Zinc Company, for $6,370.30 and interest at six per cent per annum from July 13, 1899, and decreeing that the plaintiff out of that sum, when collected, pay to the Bank of Aurora $1,000 together with interest at six per cent per annum from the date last named.

All concur, except *Brace, P. J.,* absent.