BENJAMIN S. HAMILTON v. STANDARD OIL COMPANY OF INDIANA and GEORGE V. HACKETT, Appellants.—19 S. W. (2d) 679.

Court en Banc, August 2, 1929.

536

*R. R. Brewster, Floyd M. Sprague* and *Chas. H. Mayer* for appellants.

*A. G. Knight, McAllister, Humphrey & Pew* and *Mosman, Rogers & Buzard* for respondent.

542

FRANK, J.—Suit by plaintiff, respondent here, to recover damages for personal injuries alleged to have been caused by the negligence of defendant Standard Oil Company and George V. Hackett, its foreman, while plaintiff was in the employ of and working for said Standard Oil Company. The suit was brought in the Circuit Court of Daviess County, but went on change of venue to the Circuit Court of Grundy County, where a trial was had which resulted in a verdict and judgment for plaintiff in the sum of $40,000. Both defendants appealed.

The petition, the sufficiency of which is challenged by defendants, alleges in substance that on October 12, 1921, and for many years

prior thereto, plaintiff was in the employ of defendant Standard Oil Company, as a boiler-maker, and at that time was a strong man of sound body and able to do the work required of him; that on October 12, 1921, he was injured through the carelessness and negligence of defendants; that three of his ribs were broken and torn from their connection with the spine; that the cartilages, ligaments, muscles and nerves of the right side of his body were torn and wrenched; that said defendant immediately took charge of his body, placed him in a hospital and provided him with a physician, Dr. Nickson, an agent of defendant, under whose care he remained from the date of his injury on October 12, 1921, until October 13, 1922; that on January 3, 1922, defendants advised him that he was able to do light work; that at the solicitation and upon the express promise and agreement that defendant oil company would require of him only light work and such work as would not interfere with his condition, or prevent his full and final recovery, and upon the agreement that he would be paid boiler-maker's wages for said work, he was induced to execute to said oil company a written release of his cause of action against said defendant for his said injuries; that plaintiff relied upon the promises and agreements of defendant and resumed his employment as aforesaid; that he had no technical knowledge or information as to his physical condition or his capacity to do physical labor, but that defendant had full knowledge thereof, and (he) relied upon the representations of said defendant company, that he was able to do such work, as directed by said company and its said foreman; that defendants with full knowledge of all matters and things hereinbefore alleged did on the thirteenth day of October, 1922, negligently and carelessly order, direct and require plaintiff to do certain work which required the strength and skill of a boiler-maker, and negligently and carelessly assured plaintiff that it was safe for him to do said work, and that plaintiff relying on said order, direction, requirements and assurance of safety, attempted to do said work, which required the lifting and swinging of a heavy hammer, and while attempting to do said work pursuant to the aforesaid negligent order; direction and requirements, and while swinging and attempting to swing said heavy hammer was seriously and permanently injured and crippled; that the injuries plaintiff received were occasioned by the carelessness and negligence of defendants in directing plaintiff to do and perform work which the said defendants knew, or by the exercise of due and reasonable care should have known, that plaintiff could not reasonably and safely do, and knew or by the exercise of due and reasonable care should have known that plaintiff would likely be seriously injured in attempting to do the work so ordered to be done by said defendants and each of them, and negligently assuring plaintiff that it was safe for him to

544

do said work; that plaintiff followed the orders and directions of the defendants under the belief and having confidence in the assurance aforesaid, made to him by defendants, that he was physically able to do and safely perform said work; that defendants and each of them knew or by the exercise of ordinary care and caution on their part might or could have known all of the aforementioned facts before, and at the time of negligently ordering plaintiff to do said work as aforesaid; that as a direct result of the negligence of defendants, plaintiff was seriously and permanently injured and crippled, the original wounds and injuries which he received on October 12, 1921, were reproduced, reopened and re-established. .

The allegation respecting the injuries and result thereof, will, if necessary, be noticed in course of the opinion.

Defendants challenged the sufficiency of the petition by demurrer and by objection to the introduction of any evidence, both of which were overruled. After verdict and judgment, the question here is whether or not the petition wholly fails to state a cause of action.

Appellant's contention is that the petition does not state a cause of action in that it fails to allege (1) that defendant knew of plaintiff's physical condition, (2) that plaintiff was himself ignorant of his physical condition, and (3) that defendant knew that plaintiff was ignorant of his physical condition.

There is no merit in the first contention, because the petition alleges that defendant knew of plaintiff's physical condition. The petition contains the following allegation:

"And plaintiff states that he relied upon the representations, promises and agreements of the defendant company, and resumed his employment as aforesaid, and that he had no technical knowledge or information as to his physical condition or his capacity to do physical labor, but that defendant had full knowledge thereof, and [he] relied upon the representations of said defendant company that he was able to do such work as directed by said company and its said foreman."

The petition further alleges, "that the defendants and each of them had full knowledge of all the matters and things hereinbefore alleged, and on the 13th day of October, 1922, . . . negligently and carelessly ordered, directed and required plaintiff" to do the work which caused his injury. Appellant insists that the allegation that defendant had knowledge of plaintiff's physical condition referred to the time when he resumed work on January 3, 1922, and not to October 13, 1922, the date on which he received the injuries for which this suit is brought.

The petition does not complain of anything that happened while plaintiff was doing light work from January to October 13, 1922, the day on which plaintiff was ordered to do the work that caused his

injury. The allegation regarding plaintiff's reliance on defendants' representation that he was able to do the work, is inseparably connected with the allegations relative to defendants' knowledge and plaintiff's lack of knowledge of his physical condition and capacity to do the work. No logical reason can be given why plaintiff would make these allegations regarding work that did not injure him and for which he does not sue. The petition does not limit these allegations to the time when plaintiff resumed work in January. In determining the sufficiency of the petition after verdict and judgment, we must indulge every reasonable intendment in favor of the petition. It would not be a reasonable construction of the petition to hold that these allegations referred to a time and to circumstances about which no complaint is made, unless the language of the petition forced such a construction. As bearing on the question of defendants' knowledge of plaintiff's physical condition at the time they ordered him to do the work in question, the petition further alleges "that the injuries which the plaintiff received were occasioned by the carelessness and negligence of defendants in directing plaintiff to do and perform work *which the said defendants knew or by the exercise of due and reasonable care should have known that plaintiff could not reasonably and safely do, and knew or by the exercise of due and reasonable care should have known that plaintiff would likely be seriously injured* in attempting to do the work so ordered to be done by said defendants and each of them, and by negligently assuring plaintiff that it was safe for him to do said work."

Under any view of the petition, it sufficiently alleges defendants' knowledge of plaintiff's physical condition at the time they negligently ordered him to do the work, and negligently and carelessly assured him that it was safe for him to do it.

The second complaint against the petition is that it does not allege that plaintiff was himself ignorant of his own physical condition. This fact is alleged, but it was not necessary to allege it in order to state a cause of action. It goes without saying, that if plaintiff had known at the time he attempted to do the work, that he was not physically able to do it without injury to himself, he would have been guilty of contributory negligence, but to require plaintiff to plead that he was ignorant of his physical condition, would be to require him to plead that he was not guilty of contributory negligence. Such is not the law in this State. Contributory negligence is a defense which must be pleaded in the answer to be available as such, unless it appears from the plaintiff's evidence. A plaintiff is not required to negative contributory negligence in the petition, or plead that he was without fault at the time of the injury. [Meily v. Railroad, 114 S. W. 1013, 215 Mo. 567; Crane v. Mo. Pac. Ry. Co., 87 Mo. 588.]

546

Relative to the third complaint against the petition, it may be said that if plaintiff's ignorance of his own physical condition is immaterial to a statement of plaintiff's cause of action, and for that reason need not be pleaded, no logical reason exists for requiring plaintiff to allege that defendant had knowledge of a fact which the plaintiff was not required to plead. The petition need only allege facts showing defendants' negligence. Plaintiff's ignorance or knowledge of his own physical condition would tend to show the presence or absence of his contributory negligence in attempting to do the work, neither of which is a necessary element of defendants' negligence.

Defendants cite Crowley v. Appleton, 148 Mass. 98, and Tennessee Coal Co. v. Moody, 68 So. (Ala.) 274, in support of their contention that the petition is bad because it does not allege that plaintiff was ignorant of his own physical condition and that defendant had knowledge of such ignorance. The rule is otherwise in Missouri, and for this reason it would serve no useful purpose to discuss or consider cases from other jurisdictions which announce a different rule.

The rule in this State is that "the liability of the master is measured by *his knowledge,* either actual or constructive, *of the surrounding facts and circumstances, and in determining whether the master is negligent, courts do not take into consideration what the servant knew, or what the servant did, or what the servant might have done.* A master, found negligent, might be relieved of his negligence for some act, conduct, or knowledge of the servant, but this would in no wise make the master's negligent act any the less negligent." [Italics ours.] [State ex rel. Heine Safety Boiler Co. v. Robertson, 188 S. W. 101, 103.] From this rule it seems clear that the master's liability is measured *by his own knowledge of the actual facts* and not by his knowledge of the servant's ignorance of the facts. The servant's ignorance of the facts would tend to show that he was not guilty of contributory negligence, a fact which he is not required to plead. Therefore, if the defendants in this case had knowledge, either actual or constructive, of plaintiff's physical condition and of his capacity to do physical labor, and knew or should have known that plaintiff could not reasonably and safely do the work which they ordered him to do, and that he would likely be seriously injured if he attempted it, they were guilty of negligence in ordering him to do the work, regardless of their knowledge of what plaintiff knew or did not know. The petition alleges these facts, and we hold it states a cause of action.

Defendants contend that the petition should have alleged that plaintiff was mentally incapable of appreciating his physical condition or that he was inexperienced and for that reason did not ap-

preciate the character of the work, the physical strength required to do it, or the danger in attempting to do it.

If plaintiff did not know and appreciate the danger in attempting to do the work, for the reasons stated in this contention, then he was not guilty of contributory negligence, a fact which he is not required to plead. We, therefore, rule the contention against appellant.

It is contended that the court erred in refusing instructions in the nature of demurrers to the evidence tendered by both defendants.

In this connection, it is claimed that there is no evidence that defendants' order to plaintiff to do the work, or the doing of the work by plaintiff in obedience to such order, was the proximate cause of plaintiff developing pulmonary tuberculosis, or that defendants were required to anticipate such a result, or that defendants or either of them knew or should have known that plaintiff had tuberculosis in such form that the doing of the work assigned to him would cause his passive condition to become active.

The evidence tends to show that in 1921 and for many years prior thereto, plaintiff was in the employ of defendant as a boiler-maker. In October, 1921, he received an injury and defendant company took charge of him and placed him under the care of Dr. Nickson where he remained until January, 1922, at which time defendants informed him that he was able to do light work. At that time he executed a written release of his cause of action for said injuries, and defendant company agreed to pay him two-thirds wages for the time he had lost and thereafter give him such work as he was able to and could do. He resumed light work in the shop in January, 1922, and continued in that work until April when he told defendant that the work he was doing required him to be in a stooping position most of the time which affected his back. Defendants sent him to see Dr. Nickson who gave him a thorough physical examination and defendant then gave him a job as foreman over a gang of men on new construction work which did not require him to do any physical labor. He remained on this job until October, 1922. During the summer of 1922 he was feeling better, gaining weight and strength and making a gradual continuous improvement all the time. Defendant Hackett in the summer and fall of 1922 talked to plaintiff about his physical condition, and plaintiff told him that he was still wearing straps. On October 13, 1922, defendant Hackett told plaintiff that on account of laying off all the boiler-makers, he would have to be put back to work. Plaintiff asked Hackett if he had talked to the company about it, and Hackett told him he had taken it up with the company and with the doctor and it was all right for him to go to

work. Plaintiff relied on Hackett's statement and believed that it was all right for him to resume work. On October 13, 1922, Hackett ordered and directed plaintiff to do the work which injured him. Plaintiff was under the observation of Dr. Nickson from the time of his first injury to the date of his second injury and thereafter until he went to New Mexico in 1923 for the benefit of his health.

The substance of Dr. Nickson's evidence touching plaintiff's physical condition before his second injury, was that in the spring of 1922, he discovered that plaintiff had an old tubercular lesion; that it was his judgment that he was not developing tuberculosis, but that he had it at some time but had been cured of it; that some time after plaintiff's second injury, he discovered that he was suffering from active tuberculosis; that the only way he connected the second injury with the tuberculosis was that the injury lowered his vitality to the point where resistance would be less, and his passive condition would become active from lowered resistance; that it was his opinion that before the second injury plaintiff's condition was passive and would cause him no trouble.

Relative to plaintiff's physical condition after his second injury, Dr. Nickson testified that he thought plaintiff had re-injured his back; that some muscular violence had broken some adhesions loose which accounted for his great pain; that the tearing loose of adhesions would be the natural result of plaintiff attempting to swing a sledge; that he attributed plaintiff's continued pain to the pleural adhesion continually irritating; that he thought at first that plaintiff's condition might get better, but his progressive decline indicated active tuberculosis; that this conclusion was confirmed by hemorrhages which followed, and X-ray pictures which were taken. Dr. Nickson further testified:

"Q. What is the connection now in your opinion between the swinging of this sledge and his tuberculosis? A. A tubercular lesion m'ᵧ ᴜe passive. In other words it is sealed up in a calcified wall—a lime deposit thrown around it. If nothing interferes with that, it remains passive. Break that wall and it becomes active. The conclusion is that a violent effort there—this lesion over the side of this pleural adhesion which might be passive, by muscular violence could be torn loose and you could have an active spot."

Continuing, Dr. Nickson said that he thought that when plaintiff had his first injury the two surfaces of the pleura adhered; that the pleura is a closed sack, one surface covering the ribs, the other the lungs; that when plaintiff did this heavy work, that tore the pleural adhesions loose and opened up the passive tubercular lesion and caused it to become active; that it was his opinion that some adhesion had been torn loose by muscular violence.

Dr. Nickson's testimony is corroborated by what occurred when plaintiff was injured. Plaintiff testified that he had been driving rivets for about half an hour when a great pain struck him in the back, felt like a knife—a butcher knife—rammed in his back; that he was drawing the sledge back when the pain struck him, and he collapsed and would have fallen to the floor if a co-laborer had not caught him.

It is obvious without comment that it was Dr. Nickson's opinion that plaintiff's second injury caused his active tuberculosis. At least he so testified. Defendant's contention that there was no evidence that the order to plaintiff to do the work, or his doing the work in obedience to the order was not the proximate cause of the injury, is disallowed.

Relative to the question as to whether or not defendants knew that plaintiff had tuberculosis in such form that the doing of the work would cause his passive tubercular condition to become active, and for that reason defendants should have anticipated the result which would probably follow if plaintiff did the work, it may be said that the evidence tends to show that defendants knew that plaintiff was not physically able to do the work which they ordered him to do, without probable injury to himself. Dr. Nickson was in the employ of defendant company, handled the medical work for it and looked after its injured employees. At the time of the trial and for about twenty months prior thereto the doctor had a contract with defendant company for such work. Prior to that time the company sent him such work as it wanted him to do on a fee basis. He testified that he did the greater part of defendant's work.

Dr. Nickson testified that he treated plaintiff for defendant company, and said defendant paid him for it; that it was the rule to talk over the condition of injured employees with the representatives of defendant company, if the injury was of any consequence; that he talked over plaintiff's condition with them; that he made two or three written reports of plaintiff's condition to defendant company; that when plaintiff resumed work in January, 1922, he recommended light work; that he did not consider plaintiff physically able to do the work of a boiler-maker without endangering his health, and that he did not recall ever telling anyone that he was able to do such work, or that he was ever consulted about changing him to such work.

When plaintiff was injured, Dr. Nickson was immediately called. When he arrived and learned by inquiry, how plaintiff had been injured, he said to defendant, Hackett, and Wettmore, another representative of defendant company who were there, "Now you have done it; you got the old injury all torn loose; I told you not to put him on that class of work." This statement is not denied. Neither Hackett or Wettmore testified at the trial.

Other evidence indicates that defendants relied on Dr. Nickson for information as to plaintiff's physical condition and his ability to do physical labor.

In April, 1922, when plaintiff was doing light work at the shops, he complained to defendant that the work he was doing required him to be in a stooping position most of the time, and that the stooping position caused his back to hurt. Defendants sent him to Dr. Nickson who gave him a thorough physical examination, after which defendants put him to bossing a construction gang, which did not require him to do any physical labor. The fact that defendants sent him to Dr. Nickson for a physical examination tends to show that they were relying on the doctor for information as to his condition and ability to do physical labor, and the further fact that after such physical examination, they gave him a job which did not require him to do physical labor, tends to show that they learned from the doctor that he was not in a condition to perform physical labor. When defendant Hackett told plaintiff that all the boiler-makers had been laid off and that he would have to go back to work, plaintiff asked Hackett if he had taken the matter up with *the company*. Hackett replied that he had taken it up with the company *and the doctor,* and it was all right for him to go to work.

On the day, and shortly after plaintiff was injured, defendant Hackett assisted by others took him to his home in an ambulance. When they arrived, plaintiff's wife asked Hackett how plaintiff was hurt and Hackett said he guessed they had put him to work too soon.

The reasonable and legitimate inference to be drawn from the evidence is that defendants relied on the doctor for information as to plaintiff's condition and the character of work he should be required to do, and that the doctor kept them advised as to his condition. If not, why did the doctor furnish the defendant company both written and verbal reports as to his condition? Why did defendants send plaintiff to the doctor for a physical examination in April, 1922, and then change him from the work he was doing to a boss job which required no physical labor? Why did Hackett, in October, 1922, when he ordered plaintiff to return to the work of a boiler-maker, tell plaintiff that he had talked to the doctor about it and it was all right for him to return to work, and why did the doctor say to Hackett, on the day plaintiff was injured, "I told you not to put him on that class of work."

The evidence warranted the court in submitting to the jury the question of defendant's knowledge of plaintiff's physical condition and of his inability to do the work without probable injury, at the time they ordered him to do it.

Defendants, however, insist that there is no evidence that either Dr. Nickson or defendants knew before the second injury, or were negligent in not knowing of the pleural adhesions, the tearing of which awakened the latent tuberculosis, and they were, therefore, not required to anticipate the results that followed plaintiff's doing of the work.

The evidence tends to show that defendants did know that plaintiff was physically unable to do the work without probable injury to himself. With this knowledge, it was their duty to use every reasonable precaution which ordinary care and prudence would dictate, to avoid subjecting plaintiff to risk of injury. It was not necessary to plaintiff's recovery that the evidence show that defendants could have reasonably anticipated that plaintiff's doing of the work would tear loose pleural adhesions and thereby cause the latent tuberculosis to become active.

Liability was established by showing that defendants negligently ordered plaintiff to do certain work, when they knew or by the exercise of ordinary care should have known that some injury would likely befall him if he attempted to do the work. It will not do to say that defendants may escape liability for negligently ordering plaintiff to do work, which they knew or should have known would likely injure him, because they could not reasonably anticipate what the character of the injury would be.

The rule is well stated by the St. Louis Court of Appeals in Wilborn v. Deslodge Con. Lead Co., 268 S. W. 655, as follows:

"And we may add that it was not essential to plaintiff's recovery that it appear that defendants could reasonably have anticipated that plaintiff would be injured in the precise manner in which he was injured while performing such task. It is sufficient if it appear, from all the facts and circumstances in evidence, that defendant, in the exercise of ordinary care and prudence, ought to have foreseen that some injury was likely to result to plaintiff by reason of the method thus adopted for doing the work."

Speaking closer to the question in hand, this court in Buckner v. Horse & Mule Co., 221 Mo. 700, 710, thus stated the rule:

"The liability of a person charged with negligence does not depend on the question whether, with the exercise of reasonable prudence, he could or ought to have foreseen the very injury complained of; but he may be held liable for anything which, after the injury is complete, appears to have been a natural and probable consequence of his act or omission."

We have heretofore pointed out that the evidence tends to show that plaintiff's attempt to do the work which defendants ordered him to do, tore loose pleural adhesions which caused the latent tubercular lesion in plaintiff's lung to become active. Although defendants

may not have known or could not have reasonably anticipated such a result, they are nevertheless liable because the evidence tends to show that after plaintiff's injury was complete, it appeared that such result was the natural and probable consequence of defendants' act in ordering plaintiff to do the work, and plaintiff's attempt to do the work in obedience to such order.

Contention is made that there was no evidence that plaintiff was ignorant of his physical condition and the dangers incident to his doing the work, and that defendants knew or should have known of such ignorance.

The petition was attacked because it failed to allege these facts. We have already held in the early part of this opinion that it was not necessary to allege these facts in the petition in order to state a cause of action. What we said in support of that holding applies with equal force to the contention that it was necessary to prove such facts. We refer the reader to what was there said without repeating it here. It was not necessary for plaintiff to prove facts which he was not required to plead.

It is contended that there was no evidence that plaintiff was directed to drive rivets with a hammer.

Defendants' contention in this regard will best appear from the following quotation from their brief:

"Plaintiff's evidence was that plaintiff was directed to put a winch or bracket on the tank, but plaintiff's evidence also showed that the customary and usual method of driving rivets in placing the winch or bracket on the tank was to use an air gun to drive the rivets. There is no evidence that plaintiff was told not to use an air gun, and no explanation as to why he did not use the air gun. It is submitted that a direction to 'drive rivets' which are usually driven with an air gun is not a direction to 'drive rivets with a hammer,' in the absence of some evidence which would reasonably explain why the usual and customary method could not be followed."

It is true that there was evidence that Hackett directed plaintiff to put a winch or bracket on the tank. It is also true that plaintiff's evidence showed that the customary method of doing such work was to drive the rivets with an air gun. Defendants' contention, however, overlooks the fact that there was substantial evidence that would warrant a finding that Hackett told plaintiff to drive the rivets with a hammer. Concerning this question, plaintiff testified:

"Q. And then did he tell you what to do? A. Yes, sir. He went with me up to the tank field, showed me what to do—put a winch on the side of the tank.

"Q. All right, what duties were you to perform there? A. I was to drive rivets.

"Q. You say drive rivets—What do you mean? A. Take a three-pound hammer and drive rivets, like that, you know how to drive rivets.

"Q. Were you doing what Mr. Hackett told you to do at the time? A. Yes, sir."

Plaintiff says Hackett told him what to do and that he did what Hackett told him to do. He also says that it was his duty to take a three-pound hammer and drive rivets. The legitimate and reasonable inference to be drawn from this evidence is that it was plaintiff's duty to do what Hackett told him to do, and if, as plaintiff says, it was his duty to drive rivets with a hammer, it logically follows that such was his duty because Hackett told him to do it. There is no evidence that plaintiff was furnished an air gun with which to drive the rivets. In the absence of such evidence, the mere fact that it was customary to drive rivets with an air gun, does not conclusively show that plaintiff should not have used a hammer, especially so, in the face of the fact that there was substantial evidence which warranted the court in submitting to the jury the question whether or not Hackett directed plaintiff to drive the rivets with a hammer.

It is next claimed that there was no evidence that plaintiff was directed to do work which required the lifting and swinging of a heavy hammer, the negligence alleged in the petition.

We do not so read the record. Plaintiff testified that the rivets he was driving were located above his head; that he was using a three-pound rivet maul with a handle about twenty-two inches long; that in driving rivets, it is necessary to hit them with all your strength, and that he used the rivet maul in both hands and swung it back over his shoulder. The tool used by plaintiff in driving the rivets is referred to by the witnesses as "hammer," "rivet maul" and "sledge." Dr. Nickson testified that he had seen boiler-makers using hammers and sledges to drive rivets and that it was heavy work. The allegation in reference to the swinging of a heavy hammer must be read in connection with the allegations relative to plaintiff's physical condition and his inability to do work of that character. What would have been a heavy hammer to plaintiff in his then physical condition might not have been heavy to a well able-bodied man. Keeping in mind plaintiff's physical condition, we cannot say as a matter of law that a three-pound hammer on the end of a twenty-two-inch handle was not a heavy hammer for plaintiff to use, in the manner in which he was required to use it.

554

It is contended that plaintiff's instruction P-5 was erroneous because it did not require a finding (1) that plaintiff was ignorant as to his condition and did not appreciate the dangers incident to his doing the work, and (2) that defendants had knowledge of such ignorance, either actual or constructive.

Answering the first objection to this instruction, it may be said that if plaintiff was ignorant of his physical condition and for that reason did not appreciate the dangers incident to his attempting to do the work, he was not guilty of contributory negligence. It is not essential to require the jury to so find, where, as in this case, contributory negligence is not an issue. The answer does not plead contributory negligence. Neither does such negligence appear from plaintiff's evidence. In this situation contributory negligence is not an issue in the case. [Looff v. Kansas City Rys. Co., 246 S. W. 578, 580.] The instruction criticised required the jury to find that plaintiff was, at the time, in the exercise of ordinary care for his own safety. This requirement would be a sufficient answer to defendants' criticism of the instruction if contributory negligence had been an issue in the case.

As to the next complaint against the instruction, it may be said that defendants' knowledge that plaintiff was ignorant as to his condition was not an element of defendants' negligence. A master's negligence is measured by his own knowledge of the facts, and not by his knowledge of plaintiff's ignorance of the facts. [State ex rel. Heine Boiler Co. v. Robertson, 188 S. W. 101, 103.] This contention is denied.

It is next claimed that the instruction broadened the issues in that it submits the negligence of defendants in ordering plaintiff *to drive rivets with a hammer mentioned in evidence*, when the petition alleges that defendant negligently required the *lifting and swinging of a heavy hammer and that he was injured while swinging and attempting to swing said heavy hammer.*

The contention is that the instruction submitted a different issue from the issue raised by the pleadings.

It is not disputed that plaintiff drove the rivets with the hammer described in the evidence. It is shown without contradiction that it was necessary for plaintiff to, and he actually did, lift and swing the hammer while driving the rivets. If the rivets could not be driven with the hammer, without lifting and swinging the hammer, proof that plaintiff drove the rivets with the hammer, is proof that he lifted and swung the hammer, and a finding that plaintiff drove the rivets with the hammer mentioned in evidence, necessarily includes a finding that he lifted and swung the hammer. We are

familiar with the rule that instructions must be within both the pleadings and the evidence, but we do not think the instruction in question is subject to the objection that it broadens the issues made by the pleadings. If the instruction comes within the purview of the pleadings and evidence, it is not objectional, although it does not follow the exact language of the petition. [Barnes v. Elliott, 251 S. W. 488.] We have heretofore pointed out that there was evidence which tended to show that plaintiff was directed to drive the rivets with the hammer described in evidence, and whether such hammer was a "heavy hammer" for plaintiff to use in his then condition, was a question of fact for the jury to determine.

It is next claimed that the instruction was erroneous in that it submitted the details of the contract of settlement made at the time defendant company settled with plaintiff for his first injury. The contention is that if the jury found that defendant agreed to furnish plaintiff with such work as he was able to do, it would naturally follow from that finding that the jury took the contract, and not the law, as fixing and measuring defendants' duty to plaintiff.

It is true that this is a suit for the negligent breach of a duty imposed by law because of the relationship of master and servant, and not a suit for breach of contract. But this fact, standing alone, does not determine whether the requirement in the instruction that the jury find that defendants agreed to give plaintiff such work as he was able to do, rendered the instruction erroneous. The instruction did not direct the jury to find for plaintiff in event it found that defendant made the contract in question and thereafter breached it. On the contrary the instruction required the jury to find that defendants were guilty of all the negligent acts alleged in the petition. A finding that defendants promised to furnish plaintiff such work as he was able to do, was not necessary to a verdict in favor of plaintiff. The requirement that the jury find this unnecessary fact, in addition to a finding that defendants were guilty of the alleged acts of negligence did not render the instruction erroneous, but it did place a greater burden on the plaintiff than the law places on him. [McKenzie v. Randolph, 257 S. W. 126; Rigg v. Railroad Co., 212 S. W. 878; Moyer v. Railroad, 198 S. W. 839, 844.] We have no right to presume that the jury would be misled into believing that it should base its verdict on a finding that defendants made and thereafter breached an agreement to furnish plaintiff such work as he was able to do, in face of the fact that the instruction positively required the jury to find that defendants were guilty of all of the negligent acts hypothesized in the instruction, before a verdict for plaintiff was authorized. There is nothing in the language of the in-

struction calculated to mislead the jury into believing that a verdict in favor of plaintiff could be based on anything other than an affirmative finding on all of the facts hypothesized in the instruction. In this situation, we must presume that the jury followed the instruction.

It is claimed that the following clause in the instruction is erroneous:

"If you find and believe from the evidence that at such time the plaintiff's physical condition, by reason *only* of the injuries, if any, he received on the 12th day of October, 1921, was such that plaintiff could not do such work with safety to himself," etc.

The contention is that this clause of the instruction broadened the issues made by the evidence in that it charged the defendants with being responsible for plaintiff having a latent tubercular condition at the time of the second injury.

There is no merit in this contention. The evidence discloses that plaintiff had pleural adhesions as a result of the first injury and that the doing of the work in question tore loose these pleural adhesions and caused the latent tubercular condition to become active. Dr. Moore testified that plaintiff's tubercular condition originated at the seat of the old injury. If plaintiff's evidence is to be believed, the tearing loose of the pleural adhesions would arouse the latent tuberculosis whether it existed before or after the first injury. The instruction does not require the jury to find that the latent tuberculosis was caused by the first injury.

Instruction P-3 is criticised. The instruction reads:

"The court instructs the jury that if you believe and find from the evidence that one Dr. C. E. Nickson, mentioned in evidence, was the physician of the defendant Standard Oil Company and in its employ and employed by it as such, and that he had charge and supervision over the plaintiff in relation to the treatment of plaintiff's injuries, if any, subsequent to October 12, 1921, and to and including October 13, 1922, then you are instructed that the acts, knowledge and conduct of said Dr. Nickson in relation to said injuries, if any, were the acts, knowledge, and conduct of the defendant Standard Oil Company."

The complaint made against this instruction is that the rule of *respondeat superior* does not apply to one employing a physician to treat another as Dr. Nickson was employed in this case, and for that reason his knowledge of plaintiff's condition was not defendant company's knowledge.

The evidence shows that when plaintiff was injured, defendants immediately took him to their first-aid room at the plant, called Dr. Nickson there to see him, and shortly thereafter removed him to his home in an ambulance. The precepts of humanity would prompt

such kindly acts on the part of defendants and they should not be penalized for so doing. This evidence standing alone, would not tend to show that Dr. Nickson was defendant's servant or that his knowledge of plaintiff's physical condition was defendants' knowledge, but the evidence does not stop at this point.

Other evidence warrants the conclusion that defendant company kept Dr. Nickson in its employ to treat its injured employees, including plaintiff, not only in cases of emergency but until they were able to return to work. In addition to the evidence on this subject, which we have heretofore pointed out, when Dr. Nickson was asked if he advised the character of work plaintiff should do, he answered, "Yes, in any of those cases the idea was as soon as a man could reasonably go back to work, we would let him go." Plaintiff was under the observation of Dr. Nickson from the date of his first injury in 1921, to the time he went to New Mexico in 1923 for the benefit of his health, and during that time Dr. Nickson gave him such treatment as he needed, all at the expense of defendant company. The evidence warrants the conclusion that a part and parcel of defendants' plan of conducting its business was to keep a doctor in its employ to treat its injured employees, not only in emergency cases, but until they were able to return to work. A business corporation has no lawful right to spend the corporation's money for the treatment of an employee over a long period of time, such as was done in this case, unless it does so for the benefit of the corporation. This, on the theory that corporate funds may not be used except for corporate purposes.

We may presume that defendant company kept Dr. Nickson in its employ to treat and care for its injured employees, including plaintiff, for its own benefit. We say this because if such action on its part was not in the interest of the corporation, or for the corporation's benefit, it could not have lawfully spent the corporation's money for that purpose. [Brinkerhoff Zinc Co. v. Boyd, 192 Mo. 597, 612; I. X. L. Pressed Brick Co. v. Shoeneich, 65 Mo. App. 283, 288; 14A C. J. 101.] A corporation has power to expend a portion of its funds in gratuities to servants, provided such expenditures are made for the purpose of advancing the interests of the corporation. [Putnam v. Juvenile Shoe Corporation, 307 Mo. 74, 92, 269 S. W. 593.] As defendant did expend money for the purpose of treating plaintiff, in the absence of evidence as to why it did so, we must presume right and not wrong action on its part, and presume that it was done for the benefit of the corporation, and not as a gratuity to plaintiff.

A private corporation owning and operating a hospital for the benefit of the corporation, is liable for the malpractice of its physicians and surgeons and the knowledge of such physicians and

surgeons as to a patient's condition is, by law, imputed to the corporation.

The same rule must apply in this case, because defendant, a private corporation, through its own physician treated plaintiff for its own benefit. It would not accord with reason or justice to hold that defendant company might undertake, through its own physician, to treat the plaintiff for its own benefit, then escape the consequences of any injury that might be caused by such treatment, because its officers were not versed in the science of medicine and surgery. If defendant were a charitable corporation, and its treatment of plaintiff had been a mere gratuity or charity, a different question would be presented.

Defendant cites Haggerty v. Railroad, 100 Mo. App. 424, 74 S. W. 456, a decision of the St. Louis Court of Appeals as announcing a different rule. If the court intended to hold in that case that a private corporation might, through its own physician, treat an injured employee for its own benefit, without being responsible for injurious results caused by such treatment, unless it be shown that such corporation was negligent in the selection of such physician, it is not sound law and should not be followed.

We are supported in this conclusion by two later cases of the St. Louis Court of Appeals: Smith v. Mallinckrodt Chemical Works, 212 Mo. App. 158, 251 S. W. 155; Ebert v. Emerson Electric Manufacturing Co., 264 S. W. 453, and by a decision of our own court, Phillips v. Railroad, 211 Mo. 419, 111 S. W. 109.

Some contention is made that Dr. Nickson was not the regular physician of defendant. He testified that at the time of the trial and for twenty months prior thereto he had a regular contract with defendant for doing its work; that prior to that time he did the work they gave him on a fee basis. The fact that he worked on a fee basis would not conclusively show that he was not the physician of defendant company. The instruction required the jury to find that Dr. Nickson was the physician of defendant company and in its employ and employed by it as such, and had charge and supervision over plaintiff in relation to the treatment of his injuries, if any, subsequent to October 12, 1921, to and including October 13, 1922. If the jury found these facts, then, for reasons heretofore stated, Dr. Nickson's knowledge concerning plaintiff's injuries was defendant company's knowledge, and the court did not err in so telling the jury.

It is contended that Instruction P-7 was erroneous. No authority is cited in support of this contention.

The substance of this instruction is that although plaintiff knew or by exercising ordinary care should have known that there was danger in attempting to do the work, yet that fact would not defeat his recovery, if he,

while exercising ordinary care attempted to do the work, unless such danger was so glaring, threatening and imminent, that an ordinarily prudent person would not have attempted to do said work under the same or similar circumstances. Instructions of this character have been approved so many times that it is not necessary to cite authority to support it. The question here is, its application to the facts of this case. Defendants' criticism of the instruction is thus stated in their brief:

"We submit that the law cannot presume that the master knows more or has better judgment concerning the servant's physical condition than the servant has. It seems to us that such a presumption would be absurd, yet, under this instruction, the jury are told in substance that, even though plaintiff knew all about his physical condition and all about the danger to his health in doing the work, which was dangerous, if at all, only because of plaintiff's physical condition, the master, if the master ought to have known of plaintiff's physical condition, may be held liable for the resulting injury."

Defendants misinterpret the instruction. It did not tell the jury that plaintiff could recover if he knew all about his physical condition and all about the danger to his health in doing the work. A reading of the instruction refutes this contention. Plaintiff knew that he received an injury one year prior to the time in question. Although he knew or should have known there was danger in his doing the work, yet if he did not know and appreciate his physical condition, and for that reason did not know that he would probably be injured if he attempted to do the work, but relied on defendants' assurance that it was safe for him to do the work, and while exercising ordinary care, attempted to do it, then the mere fact that he knew there was some danger in his attempting to do the work will not defeat his right to recover, unless an ordinarily prudent person under the same situation and circumstances would have known that the probability of injury was imminent and threatening and for that reason would have refused to do the work. This is the effect of the instruction. In view of the peculiar facts in the case, the instruction is awkwardly worded, but it is not misleading.

Defendants make the further contention that there is sound reason for holding the master to the exercise of judgment superior to that of the servant regarding the master's premises and instrumentalities, but there is no reason for holding the master's judgment as to the servant's physical condition, superior to that of the servant.

The law does not presume that the master's knowledge of the servant's physical condition is superior to that of the servant. That question is one of fact to be determined by the trier of the facts.

Our reason for so holding in this case, is because the petition alleged, the evidence tended to show and the trial court found that the defendants knew, and the plaintiff did not know his physical condition. This is not a case of overexertion where it should be held that the servant is the best judge of his own strength. The question is not whether plaintiff had physical strength sufficient to swing the hammer and drive the rivets, but rather, what effect the exercise of such strength in the swinging of the hammer would have on plaintiff's condition which was produced by a former injury, internal in character. It is evident that the doctor's judgment on this question would be superior to that of plaintiff, and the evidence tends to show that the doctor advised the defendants, but did not inform the plaintiff as to his physical condition.

It is contended that the court erred in admitting the testimony of Dr. Nickson to the effect that the swinging of "this sledge" was connected with the injury, and that the doing of "this heavy work" caused plaintiff's injury.

The questions to which objection was made were (1) what is the connection now in your opinion between the swinging of this sledge and his tuberculosis? and (2) when he did this heavy work that tore loose that pleura?

The first contention is that these questions erroneously assumed the fact that plaintiff was swinging a sledge and doing heavy work, when there is no evidence that he was using a sledge.

There is no merit in this contention. The witnesses for both parties agree that plaintiff used a three-pound hammer on a twenty-two inch handle. Some of the witnesses referred to this hammer as "sledge," "rivet maul" and "hammer."

It is next contended that these questions called for a statement of absolute facts as to whether the accident actually happened and as to whether it happened in a particular manner.

Defendants did not object to these questions on the ground that they called for a statement of facts. The objection made was that the questions called for an improper conclusion on the part of the witness and invaded the province of the jury. This court in Kinchlow v. Kansas City K. V. & W. Ry. Co., 264 S. W. 416, 417, has so aptly spoken to a like contention, that we quote therefrom:

"It may be urged that the question called for a statement of fact by Dr. Hayes and not his opinion merely. But he was simply testifying as a physician who had not seen the accident, and it should be implied that the question simply called for his opinion. In any event, the objection urged was not that the question called for the statement of an absolute fact, and not for an opinion, but simply that it invaded the province of the jury, which was the specific objection in the O'Leary Case, supra, and was there held untenable."

It must also be remembered that Dr. Nickson testified without objection that when he was called to see plaintiff on the day he was injured he learned that plaintiff was put back at regular boiler-making work and in swinging a sledge had injured himself. He examined the plaintiff and thereafter treated and cared for him. These facts qualified the doctor to give his opinion as to what caused plaintiff's condition, although he was not present when the accident occurred. We are sustained in this conclusion by a decision of this court in Kinchlow v. Kansas City K. V. & W. Ry. Co., supra, whereat we said:

"Moreover, while Dr. Hayes says he was not plaintiff's physician and did not prescribe for him, yet he was called to examine plaintiff by the company's physician, Dr. Cambler, a day or two after he was said to have been injured; that Dr. Cambler asked him to examine plaintiff and tell him about plaintiff's injury; and that Dr. Cambler and plaintiff told him how the accident happened and how he was hurt. 'They wanted him to examine plaintiff because he was hurt on their car.' He examined plaintiff three or four times. From this it is clear that Dr. Hayes was something more than a mere expert to testify at the trial in response to hypothetical questions, and that he was a consulting physician and told the company's physician, Dr. Cambler, what condition he found plaintiff in to aid the latter in treating the plaintiff. Dr. Cambler was also plaintiff's physician and did treat and prescribe for him. Under such circumstances, we think Dr. Hayes was also an attending physician, and as such it was competent for him to give his opinion as to what caused the condition in which he found plaintiff, as was held by this court in Clooney v. Wells, 252 S. W. l. c. 75, opinion by GRAVES, J."

No error was committed in admitting the testimony of Dr. Nickson.

Error is assigned in the giving of Instruction P-8 on the measure of damages because it fixes the maximum amount which the jury may allow without disclosing any reason why the court fixed the maximum at the figure named.

In Bond v. St. Louis-San Francisco Ry. Co., 288 S. W. 777, 785, cited by appellant, this court criticized an instruction on the measure of damages because it gave no reason why the court fixed the maximum amount which the plaintiff might recover, but it did not reverse the case on that account. Instruction P-8 is not subject to this criticism because it informed the jury that the maximum amount which plaintiff might recover, *was the amount sued for.*

On original submission of this case in Division One, appellants claimed that the verdict of $40,000 was excessive. An opinion was adopted in division affirming the judgment on condition that the plaintiff within ten days remit the sum of $15,-000. The *remittitur* was entered within the time specified.

Since the cause reached Court en Banc on transfer, appellants have made no claim that a recovery of $25,000 would be excessive, and plaintiff is evidently satisfied because he asked that the divisional opinion affirming the judgment for that amount be readopted. We understand that neither party is bound by the decision in division, and as the question is still open, we have carefully examined the evidence touching plaintiff's injuries, and find no basis for a claim that a recovery of $25,000 would be excessive.

We have not cited and discussed many of the cases cited by both parties in support of their contentions, but we have read and considered them, but did not discover anything which we think runs counter to the views herein expressed.

We have concluded that the judgment should be affirmed for $25,000. Therefore, if plaintiff will within ten days remit $15,000 of the judgment, it will stand affirmed in the sum of $25,000 as of the date of its rendition. Otherwise the judgment is reversed and cause remanded. *White, C. J.,* and *Atwood, Gantt* and *Blair, JJ.,* concur; *Ragland, J.,* concurs in the result; *Walker, J.,* absent.